**Darrick GRIMES and Yolanda Grimes, on behalf of themselves and a class of others similarly situated, Plaintiffs,**

v.

**FREMONT GENERAL CORPORATION, Fremont Investment and Loan, WCS Lending LLC, Jonathan Tanenbaum, Nadene McBean, America's Servicing Company, U.S. Bancorp and U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006–FRE–1, 3 Day Appraisal Services, Phil Aarons, David Abrams, Gailen Properties, Inc., GFI Mortgage Bankers, Inc., "John Doe" and "Jane Doe," the last two names being fictitious said parties being individuals, if any, having any involvement in the fraud perpetrated on Plaintiffs, and XYZ–1 Corporation and XYZ–2 Corporation, the last two**

names being fictitious, it being the intention of Plaintiffs to designate any corporation or entity having any involvement in the fraud perpetrated on Plaintiffs described herein, Defendants.

Case No. 08–CV–1024 KMK.

United States District Court,
S.D. New York.

March 31, 2011.

Darrick Grimes and Yolanda Grimes, Newburgh, Pro Se Plaintiffs.

Kenneth J. Flickinger, Esq., Knuckles, Komosinski & Elliot, LLP, Elmsford, Counsel for Defendants Fremont General Corporation and Fremont Investment and Loan.

Matthew J. Bizzaro, Esq., Noah Numberg, Esq., L'Abbate, Balkan, Colavita & Conti, Garden City, Counsel for Defendant WCS Lending, LLC.

Steven M. Hecht, Esq., Lowenstein Sandler PC, New York, Counsel for Defendant U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006–FRE–1.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge.

Darrick and Yolanda Grimes ("Plaintiffs"), proceeding pro se, bring this action against Fremont General Corporation ("FGC") and Fremont Investment and Loan ("FIL") (collectively, "Fremont"), WCS Lending LLC ("WCS"), Jonathan Tanenbaum ("Tanenbaum"), Nadene McBean ("McBean"), U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006–FRE–1 ("U.S. Bank"), and 3 Day Appraisal Services (collectively, "Defendants"),[1] for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.; the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, et seq.; the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; the Civil Rights Act, specifically 42 U.S.C. §§ 1981, 1982, & 1985(3); and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; as well as fifteen state law claims.[2] Fremont, WCS, and U.S. Bank (collectively, the "Moving Defendants") have each

---

1. Plaintiffs have also named as Defendants "John Doe" and "Jane Doe," and XYZ–1 Corporation and XYZ–2 Corporation, as fictitious names of individuals or entities "having any involvement in the fraud perpetrated on Plaintiffs."

 The following Defendants named in the Amended Complaint have also been terminated from this action: America's Service Company ("ASC"), U.S. Bancorp, Phil Aarons, David Abrams, Gailen Properties, Inc., and GFI Mortgage Bankers, Inc. (Dkt. No. 95.)

 The Court notes that according to the docket, Defendants Tanenbaum, McBean, and 3 Day Appraisal Services have never been served in this action, and have not appeared.

2. The state law claims include professional negligence and negligent training and supervision, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, fraud and deceit, common law fraud, constructive fraud, equitable fraud, civil conspiracy to commit fraud; violations of N.Y. Gen. Bus. L. § 349, N.Y. Banking L. §§ 6–1 & 598, and N.Y. Exec. L. § 296; and class action claims for violation of the Donnelly Act, unfair and deceptive business practices, and unjust enrichment.

 However, as Plaintiffs have acknowledged, "[a] pro se plaintiff may not seek to represent the interests of third-parties." Williams v. Citibank, N.A., 565 F.Supp.2d 523, 526 n. 4 (S.D.N.Y.2008) (emphasis in original) (internal quotation marks omitted); see also 5 James Wm. Moore et al., Moore's Federal Practice § 23.25(2)(c)(v) (3d ed.) ("[A] pro se class representative cannot adequately represent the interests of other class members."). Accordingly, Plaintiffs' eighth, ninth, and tenth causes of action—for violation of the Donnelly Act, unfair and deceptive business practices, and unjust enrichment—which are all brought as class action claims, are dismissed without prejudice.

 Plaintiffs have not asserted each of their twenty-two causes of action against every De-

moved to dismiss all of Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6).[3] For the reasons stated herein, the motions to dismiss are granted in part.

## I. Background

The Amended Complaint is 161 pages long and contains 722 paragraphs. It sometimes contains conflicting dates and descriptions of events, and Plaintiffs are not always clear about which Defendants purportedly took which actions. However, for purposes of deciding the instant motions to dismiss, the Court accepts as true the allegations contained in Plaintiffs' Amended Complaint, described below, and construes them in the light most favorable to Plaintiffs.

### A. Factual Background

Plaintiffs Darrick and Yolanda Grimes ("Plaintiffs") are African–American owners of a house located at 23 Stacy Lee Drive, in Newburgh, New York (the "Newburgh home"). (Am. Compl. ¶¶ 17–18.) At the time of the transaction at issue, Plaintiffs were employed as legal assistants, earning a combined $103,000 per year. (*Id.* ¶ 61.)[4]

According to Plaintiffs, Defendant FGC is a financial services holding company that engages in real estate lending operations through its wholly owned subsidiary, Defendant FIL, "a wholesale lender [that] obtains] all of its loans through a network of independent mortgage brokers." (*Id.* ¶¶ 19, 23.) Defendant WCS is a licensed mortgage broker based in Florida. (*Id.* ¶ 28.) Defendant Tanenbaum was a mortgage broker at WCS. (*Id.* ¶ 31.)[5] Defendant U.S. Bank is a banking association acting as trustee for Master Asset Backed Securities Trust 2006 FRE–1, and "is the trustee for the securitization pool that contains [ ] Plaintiffs [sic] loan pursuant to a Pooling and Service Agreement dated August 1, 2006." (*Id.* ¶¶ 35, 38.)[6]

#### 1. Purchase and Financing of the Newburgh Home

Plaintiffs owned a home in St. Albans, New York (the "St. Albans home"), which they placed on the real estate market on or about July 17, 2005. (*Id.* ¶¶ 135–36.) On August 1, 2005, Plaintiffs signed a contract to purchase the Newburgh home for $435,000, and submitted a $20,000 down payment to the sellers. (*Id.* ¶¶ 135, 137.)

---

fendant. This opinion addresses the claims that apply to Fremont, WCS, and U.S. Bank, which are the only Defendants that have been served but not terminated in this action.

3. Fremont also moved to dismiss the claims against FGC under 11 U.S.C. § 362(a). FGC filed a petition for Chapter 11 bankruptcy on June 18, 2008, in the United States Bankruptcy Court for the Central District of California, Santa Ana Division. (Dkt. No. 36.) Fremont argued that by filing the Amended Complaint on December 12, 2008 (Dkt. No. 48), and serving it on FGC, Plaintiffs violated 11 U.S.C. § 362(a), which states that filing a bankruptcy petition stays the continuation of a judicial action that was commenced against the debtor before the commencement of the bankruptcy case. (Mem. of Law in Supp. of Defs. Fremont Reorganizing Corporation f/k/a Fremont Investment & Loan, and Fremont General Corporation's Mot. to Dismiss the

Compl. Pursuant to Fed.R.Civ.P. 12(b)(6) and 11 U.S.C. 362(a) ¶¶ 85–86.) Fremont has since informed the Court that FGC emerged from bankruptcy on May 25, 2010 (Dkt. No. 125), and at oral argument withdrew this argument. Accordingly, Fremont's motion to dismiss the Amended Complaint against FGC pursuant to 11 U.S.C. § 362(a) is denied as moot.

4. Plaintiffs later state that they earned $131,000 per year. (Am. Compl. ¶¶ 163, 166.)

5. Tanenbaum is now deceased. (Am. Compl. ¶ 46.)

6. According to the Amended Complaint, 3 Day Appraisal Services, which is currently named as a Defendant but has not been served in this action, has a New York address. (Am. Compl. ¶ 50.)

According to Plaintiffs, Yolanda Grimes had a good credit score, but Darrick Grimes had a poor one. (*Id.* ¶ 61.) To finance the purchase, Plaintiffs applied for a mortgage from Washington Mutual, but were denied on September 5, 2005. (*Id.* ¶ 139.) Subsequently, Plaintiffs searched for other financing sources, and decided to use Tanenbaum, who told Plaintiffs he would help them " 'obtain reasonable financing,' " and that WCS " 'would provide everything' for the closing and mortgage process." (*Id.* ¶¶ 140, 145, 151.) [7] Based on Tanenbaum's purported statements and assurances, "Plaintiffs did not seek assistance from another mortgage broker, bank or appraiser." (*Id.* ¶ 152.) Plaintiffs allege that Tanenbaum told them that they would qualify for traditional loan products with a fixed interest rate of, at the most, 7%. (*Id.* ¶ 205.) However, Plaintiffs allege that, through Fremont, WCS actually arranged a 100% no-documentation-financing Adjustable Rate Mortgage ("ARM") loan for Plaintiffs, which for the first two years of the loan, consisted of a lower fixed rate and lower monthly payments, followed by a higher, adjustable rate for the next twenty-eight years. (*Id.* ¶¶ 8, 55.) [8] Plaintiffs claim that they "would not have entered into the transaction but for WCS Lending's misrepresentations, false promises, and other negligent advice." (*Id.* ¶ 83.) Plaintiffs never met with Tanenbaum in person. (*Id.* ¶ 167.)

Plaintiffs allege that on or about September 9, 2005, Tanenbaum had them sign a loan application that purportedly misstated the income of Yolanda Grimes; Plaintiffs were not given a copy of the application, and were not asked to provide documentation of their income, employment, or assets. (*Id.* ¶ 65.) Exhibits attached to the Amended Complaint indicate that WCS submitted several sets of documents to Fremont in September and October 2005.[9] First, Plaintiffs assert that upon information and belief, WCS employees Tanenbaum and McBean "intentionally and knowingly" submitted a mortgage application and related pre-disclosure documents to Fremont on September 13, 2005, that "contained falsified data and forged signatures on the application in many material respects." (*Id.* ¶¶ 158, 212–13.) [10]

---

7. It is unclear when Plaintiffs first began working with Tanenbaum. Plaintiffs first allege that they found him through an internet search on September 6, 2005 (Am. Compl. ¶ 140), and that Tanenbaum emailed them to introduce himself and WCS on September 7, 2005, (*id.* ¶ 141). However, Plaintiffs also state that they had several discussions with Tanenbaum in late August and early September 2005. (*Id.* ¶ 149.) Plaintiffs also allege that they decided to purchase the Newburgh home after these discussions, although Plaintiffs previously stated that they had already signed the sale contract on August 1, 2005. (*Id.*)

8. Plaintiffs allege that Tanenbaum told them that they were getting a no-documentation loan because they had good credit, and that they would have no problem being approved for the requested loan because of their salary. (Am. Compl. ¶ 166.)

9. Plaintiffs attached numerous exhibits to their initial Complaint. (Dkt. No. 1.) However, although the Amended Complaint continues to refer to these exhibits, Plaintiffs did not actually attach them to their amended filing. Given Plaintiffs' pro se status, the Court will treat these exhibits as if they were attached to the Amended Complaint.

10. As explained *infra*, the Court declines to address Plaintiffs' state law claims at this time, and as such, need not address the merits of Plaintiffs' fraud claim in this Opinion. However, the Court does note that allegations of fraud are not supposed to be pled upon information and belief, unless the fraud alleged is "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Here, Plain-

These documents included an application for a $405,000 2/28 ARM loan at an 8% interest rate, indicating that Plaintiffs had $1,076 in monthly rental income (Compl. Ex. 2), and a HUD Settlement Statement containing the same information, (*id.* Ex. 4). Fremont's records indicate that it received this loan application on September 16, 2005, and, on the same date, Fremont approved a counter-offer of: (1) a 2/28 ARM loan for $405,000, at an initial interest rate of 8.45%, and (2) a second loan for $22,500, at a fixed interest rate of 12.45%. (*Id.* Ex. 5.) The approval form states that these documents were being sent to Majestic Settlement Services to be verified by Plaintiffs. (*Id.*) Plaintiffs allege that Fremont approved their mortgage financing based on this fraudulently submitted mortgage loan application (Am. Compl. ¶ 70), though there is no assertion that Fremont knew that the application contained false information. Plaintiffs further allege that they were not told that this application had been approved, or of any of the material terms of the financing that they were being offered, until the closing on October 12, 2005. (*Id.* ¶¶ 169, 222.) [11]

Next, Plaintiffs allege that on or about September 14, 2005, they received a mortgage application and disclosure documents from WCS for a potential Fremont loan, that Plaintiffs characterize as "confusing"; however, Plaintiffs admit that they signed these documents on September 20, 2005. (*Id.* ¶¶ 69, 71.) Despite Plaintiffs' claims that this application offered a loan with a fixed interest rate of 7% (*id.* ¶ 226), the actual documents, which Plaintiffs themselves have submitted as exhibits, clearly and repeatedly stated that the loan was not a fixed rate, but instead was a 2/28 ARM mortgage. (Compl. Ex. 3.) The completed loan application also stated—on pages that Plaintiffs concede they signed—that Plaintiffs earned $1,076 per month in net rental income. (*Id.*) [12] Plaintiffs also signed a document acknowledging that their "interest rate [was] currently floating and [was] subject to daily changes based upon market fluctuations," and a "Good Faith Estimate" of their likely settlement charges, listing anticipated fees, charges, taxes, and insurance payments in the amount of $12,844.75. (*Id.*)

---

tiffs have attached the supposedly forged documents, but do not say why they believe it was Tanenbaum and McBean who forged them, or what information was falsified besides the rental income.

11. However, Fremont sent a letter to Plaintiffs at their St. Albans home, dated October 11, 2005, stating that Fremont had delivered a counter-offer to WCS as Plaintiffs' broker on September 16, 2005, and seeking to confirm that Plaintiffs had received it. (Compl. Ex. 7.) Plaintiffs make no mention of receiving this notice in their Amended Complaint (though it is attached to Plaintiffs' Complaint), and instead state that "[a]t no point in time, were . . . Plaintiffs aware that the mortgage loans had been approved on September 16, 2005," and that Tanenbaum, Fremont, and WCS intentionally concealed that the loan had been approved, and on what terms. (Am. Compl. ¶¶ 220, 227–29.)

12. Plaintiffs allege that Tanenbaum had "informed [ ] Plaintiffs that he needed a Residential House Lease to support their mortgage application," in case the St. Albans home was not sold prior to the closing date on the Newburgh home; however, Plaintiffs claim that they "strongly opposed any suggestion" that they had rental income, and did not provide a lease. (Am. Compl. ¶¶ 216–17.) Plaintiffs also allege that WCS then provided "loan application and related disclosure documents for Plaintiffs to sign that falsely indicated that they were earning 'rental income' from their [St. Albans] home." (*Id.* ¶ 157.) However, Plaintiffs do not dispute that they signed these documents on September 20, 2005, nor do they allege that they did not see the rental income listed. Plaintiffs do maintain that they never received rental income from the St. Albans home. (*Id.* ¶ 199.)

Plaintiffs allege they became concerned that they had not received the final mortgage numbers or a confirmed written financing commitment. (Am. Compl. ¶¶ 229–32.) Plaintiffs allege that they "were confused and very reluctant about going forward with the property purchase"; but, after "numerous phone calls" with WCS, during which WCS used unspecified "high pressure tactics to convince Plaintiffs through deception and misrepresentation to go forward with the closing," Plaintiffs decided to proceed "because they feared losing their $20,000 deposit." (*Id.* ¶¶ 182–84, 236.) Plaintiffs also state that on October 11, 2005, they called their lawyer, Keith Schultzman (who represented them at the closing), and WCS to get confirmation of the final closing numbers and a copy of the HUD–1 Settlement Statement (*id.* ¶ 187); however, the Amended Complaint does not indicate the result of these conversations.

Ultimately, the sale of the Newburgh home closed on October 12, 2005. (*Id.* ¶ 73.) Plaintiffs claim that they were "shocked" at the closing to find out for the first time the actual terms of their loans, and that they "closed under extreme duress" (*id.* ¶¶ 251, 253), though Plaintiffs admitted at oral argument that they had their lawyer with them at the closing.[13] According to Plaintiffs, during the closing they "were instructed to sign various documents and initial numerous individual pages" that were not explained to them (again, in the presence of their attorney), but they were assured—by an unspecified person—"that each document was in order and should be signed, including the mortgage application and related disclosure documents that [were] submitted and signed on September 13, 2005," which are the documents that Plaintiffs now claim were forged. (*Id.* ¶¶ 188–89.)[14]

Plaintiffs entered into two mortgage agreements with Fremont on October 12, 2005. (*Id.* ¶ 262.) The first was a thirty-year mortgage for $405,000, with the first two years set at a fixed interest rate of 8.45%, and a variable, higher rate for the remaining twenty-eight years (the "first mortgage"). (*Id.*) The second loan was a fifteen-year mortgage for $22,500, at a fixed interest rate of 12.75% (the "second mortgage"). (*Id.*) At the closing, Plaintiffs signed another loan application with the same terms and information as were included on the application they signed on September 20, 2005 (albeit now with the higher 8.45% interest rate), and again signed and/or initialed disclosure statements, that, inter alia, indicated that the loans could be assigned, explained the mechanics of their ARM loan and that the

---

**13.** Plaintiffs allege that at the closing, they learned that the interest rate was different than on the application that they signed, that the mortgage had become an ARM instead of fixed rate, and that there were fees that had not previously been discussed. (Am. Compl. ¶ 252.) However, as previously noted, despite Plaintiffs' assertions as to what they may have been told orally by Tanenbaum, Plaintiffs have not identified any application offering a fixed rate mortgage; instead, every application submitted with the Complaint, including those that Plaintiffs admit to seeing and signing before the closing, indicated that a 2/28 ARM loan was being offered.

**14.** It is unclear who assured Plaintiffs that the documents were in order. Plaintiffs first allege that "Tanenbaum instructed and convince [sic] Plaintiffs to 'just sign' and that '[they] would take care of that later'" (Am. Compl. ¶ 189), but later state that Tanenbaum was on vacation during the closing and that they were unable to reach him, (*id.* ¶ 253). Plaintiffs contend that after the closing, they "were worried that they had been pressured into a bad deal without being allowed to … properly consult with their attorney" (*id.* ¶ 254), but they offer no details about the circumstances that prevented them from consulting with their lawyer.

interest rate would change after the first two years, and listed the fees to be paid to the mortgage broker. (Compl. Ex. 13.) Plaintiffs allege that WCS was paid $11,365 in application and broker fees from the loan proceeds, and that Fremont paid WCS an additional $6,050 as a yield spread premium. (Am. Compl. ¶ 75.)

### 2. Plaintiffs' Race–Related Allegations

Plaintiffs allege that Tanenbaum used a "race-based" sales pitch that emphasized WCS's "purported loyalties to lenders nationwide and other borrowers and minority home buyers like the Plaintiffs," and that was "consciously intended to overcome and disarm prospective minority home buyers and borrowers." (Id. ¶¶ 146–47.) According to Plaintiffs, Tanenbaum "aggressively continued to play upon the race issue." (Id. ¶ 148.) [15] Plaintiffs further state that "[u]pon information and belief, [ ] WCS [ ] targeted its discriminatory activities against people of color and neighborhoods in northern New York in which the majority of residents are non-white" (id. ¶ 197), but they do not specify the basis for this belief, the discriminatory activities to which they are referring, or how the targeting was conducted. Plaintiffs also allege that "Defendants targeted minority homeowner borrowers with bogus financing terms and grossly unfair lending products for the sole purpose of sandbagging borrowers at closing by steering them into unsafe and unsound adjustable rate mortgage products at the eleventh hour." (Id. ¶ 271). [16] According to Plaintiffs, these unfair loans "were aggressively marketed through Fremont's network of brokers to the African–American homeowners." (Id. ¶ 604.)

In addition, Plaintiffs allege that Fremont and WCS "targeted African–Americans for higher cost subprime mortgage loans, while directing Caucasian applicants, with the same qualifications after accounting for risk, into lower cost loans," and that Plaintiffs themselves were targeted as part of this scheme. (Id. ¶¶ 556, 558.) Plaintiffs further assert, without providing any supporting facts, that "Defendants intentionally providing [sic] Plaintiffs with grossly inferior terms, conditions, and/or privileges of services in connection with the financing transaction on the basis of race and color." (Id. ¶ 568.)

### 3. Post–Closing Events

Fremont transferred the servicing of Plaintiffs' first mortgage to American's Servicing Company ("ASC") on February 1, 2006. (Compl. Ex. 9.) Plaintiffs also allege that this loan was "securitized and placed into a trust," of which U.S. Bank is the trustee and current custodian. (Am. Compl. ¶¶ 281–82.) According to Plaintiffs, they made monthly payments exceeding $4,000 including taxes and insurance for eight months after the closing, at which point, having realized that they would be unable to refinance the loans, and having fallen behind in their bills and incurred substantial debt, they began unsuccessfully to try to modify the loans. (Id. ¶¶ 55, 200.) Plaintiffs stopped making payments on their first mortgage in September 2006. (Id. ¶ 84.) On December 26, 2006, U.S. Bank filed a foreclosure action against

---

**15.** Plaintiffs first allege that Tanenbaum "played upon the Plaintiffs' race in an effort to convince them that he, as an American 'Jewish Broker' was motivated by a desire to help them obtain a home[ ][and] repeatedly invoked his own Jewish race and religious background to both disarm and reassure the Plaintiffs into believing that he would 'never cheat them.' " (Am. Compl. ¶ 57.) However, Plaintiffs later assert that "Tanenbaum assured [Plaintiffs] that as a fellow 'African American and Muslim,' he would never 'cheat [them].' " (Id. ¶ 185.)

**16.** Plaintiffs do not specify which Defendants targeted certain borrowers, or how this targeting was conducted.

Plaintiffs in the Supreme Court of the State of New York, County of Orange. (Decl. of Steven M. Hecht in Supp. of Def. U.S. Bank's Mot. to Dismiss the Am. Compl. Ex. F.) [17]

On December 28, 2006, Plaintiffs sent a letter to ASC as a "formal notice" that they were exercising their right of rescission and cancelling their loan based on violations of TILA. (Compl. Ex. 8, at unnumbered page 1.) On January 2 and 8, 2007, Plaintiffs submitted letters to various state and federal agencies alleging TILA, HOEPA, RESPA, FHA, and ECOA violations by Fremont, U.S. Bank, and WCS. (*Id.* Ex. 10, at unnumbered pages 1, 7, 17, 21.) Plaintiffs allege that on or about March 7, 2007, the New York State Banking Department provided Plaintiffs with a copy of WCS's response to their complaint, including copies of the various closing documents, mortgage application, and pre-disclosure documents, although Plaintiffs also allege that it was actually Fremont that submitted these documents to the Banking Department in response to Plaintiffs' complaints. (Am. Compl. ¶¶ 287, 392, 397.) [18]

### B. Procedural Background

Plaintiffs, proceeding pro se, filed an initial complaint on January 31, 2008

against FGC, FIL, WCS, Tanenbaum, ASC, U.S. Bancorp, and U.S. Bank. (Dkt. No. 1.) Pursuant to the order of the Honorable John G. Koeltl, dated November 26, 2008 (Dkt. No. 47), Plaintiffs filed their Amended Complaint on December 12, 2008, (Dkt. No. 48).[19] Plaintiffs' Amended Complaint added McBean, 3 Day Appraisal Services, Phil Aarons, David Abrams, Gailen Properties, Inc., GFI Mortgage Bankers, Inc., John and Jane Doe, and XYZ-1 and XYZ-2 Corporations as Defendants. (Dkt. No. 48.) On August 8, 2009, this case was reassigned to the undersigned. (Dkt. No. 89.) The Court held a conference with the Parties on October 27, 2009. (Dkt. No. 94.) On November 12, 2009, Plaintiffs voluntarily dismissed Defendants ASC, U.S. Bancorp, Phil Aarons, David Abrams, Gailen Properties, Inc., and GFI Mortgage Bankers, Inc., without prejudice. (Letter from Pls. to the Ct., dated Nov. 9, 2009 (Dkt. No. 95).) On March 3, 2010, Defendants WCS, U.S. Bank, and Fremont filed the instant motions to dismiss all of Plaintiffs' claims in the Amended Complaint. (Dkt. Nos. 106, 110, 117.) The Court held oral argument on March 9, 2011. (Dkt. No. 121.)

---

**17.** On February 28, 2011, the Court issued an order inquiring into the current status of this foreclosure action. (Dkt. No. 126.) U.S. Bank has informed the Court that in November 2007, the Orange County Supreme Court denied U.S. Bank's motion for summary judgment and granted Plaintiffs' cross-motion to file an Amended Answer asserting an affirmative defense for fraud and misrepresentation. (Letter from Steven M. Hecht to the Ct., dated Mar. 3, 2011 (Dkt. No. 128).) In addition, after Plaintiffs filed the instant action in this Court in January 2008, U.S. Bank "elected to refrain from proceeding with the foreclosure action until this federal action is resolved." (*Id.*) "Accordingly, the foreclosure action is currently pending, but is not being actively prosecuted by U.S. Bank at this time." (*Id.*)

**18.** The Amended Complaint contains numerous allegations regarding Fremont's general business practices; however, it does not allege that these specific practices were at issue in Plaintiffs' mortgage. (Am. Compl. ¶¶ 86–97.) Plaintiffs also emphasize that on March 7, 2007, Fremont entered into an Order to Cease and Desist with the FDIC regarding Fremont's "unsafe or unsound banking practices and violations of law and/or regulations." (*Id.* ¶¶ 98–103, 283–86; Compl. Ex. 11.) However, this Order is not addressed specifically to Plaintiffs or their loan.

**19.** Judge Koeltl's order also denied as moot, without prejudice to renewal, motions to dismiss filed by Defendants WCS, ASC, U.S. Bancorp, and U.S. Bank. (Dkt. No. 47.)

## II. Discussion

### A. Standard of Review

#### 1. General Standards

■ "On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). Furthermore, when considering a motion to dismiss a pro se complaint, the court must interpret the complaint liberally to raise the strongest claims that the allegations suggest. *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000); *see also Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (noting that courts should hold pro se pleadings "to less stringent standards than formal pleadings drafted by lawyers" (citation omitted)). However, mere "conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (second alteration in *Twombly* ) (internal quotation marks and citations omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'shown'—'that the pleader is entitled to relief.' " (alteration and citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 424–25 (2d Cir.2008) (holding that district court properly took judicial notice of and considered media reports, state court complaints, and regulatory filings on a motion to dismiss); *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005) ("The court may also consider matters of which judicial notice may be taken, even if the corresponding docu-

ments are not attached to or incorporated by reference in the complaint."). In the motion to dismiss context, however, the court should generally take judicial notice "to determine what statements [the documents] contain[ ] ... not for the truth of the matters asserted." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

As previously mentioned, Plaintiffs attached numerous exhibits to their initial Complaint (Dkt. No. I), but appear mistakenly not to have attached them again to their Amended Complaint. In light of Plaintiffs' pro se status, the Court will treat these exhibits as if they were attached to the Amended Complaint, and has considered them in deciding these motions to dismiss.[20]

### B. TILA Claim

As previously noted, Plaintiffs' Amended Complaint contains seven federal and fifteen state causes of action. The Court will first consider the federal causes of action. In their eleventh cause of action, Plaintiffs claim that all of the Moving Defendants violated TILA, 15 U.S.C. § 1601 *et seq.*, by failing to provide required material disclosures and by making "one or more material changes to the terms of the consumer credit transaction based upon forged signature [sic] and falsified information in the mortgage application and pre-disclosure documents." (Am. Compl. ¶¶ 392–93.) For these alleged misdeeds, Plaintiffs seek rescission of their mortgages and monetary damages. (*Id.* ¶ 399.)

TILA was enacted by Congress to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit ...." 15 U.S.C. § 1601(a); *see also Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998) (discussing TILA's purpose). Accordingly, "TILA requires that creditors provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights, as well as notice of the borrower's right of rescission." *Fiorenza v. Fremont Inv. & Loan*, No. 08–CV–858, 2008 WL 2517139, at *2 (S.D.N.Y. June 20, 2008) (internal quotation marks omitted). Creditors who fail to comply with these disclosure requirements are subject to civil liability. *See id.* at *3; *see also* 15 U.S.C. § 1640(a). "Consistent with its purpose, TILA is meant to be construed liberally in favor of the consumer." *Schnall v. Marine Midland Bank*, 225 F.3d 263, 267 (2d Cir.2000) (alteration and internal quotation marks omitted). "TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made." *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 898 (3d Cir.1990). Indeed, a "court need find only a single violation of the statutory requirements to hold [a] defendant liable under TILA." *Clement v. Am. Honda Fin. Corp.*, 145 F.Supp.2d 206, 210 (D.Conn. 2001) (internal quotation marks omitted).[21]

---

**20.** Plaintiffs also have submitted a "Forensic Handwriting Analysis Expert Report" to support their contention that certain mortgage transaction documents were forged. (Aff. of Darrick Grimes in Supp. of Pls.' Mem. of Law Ex. A.) However, this document was not attached to, referred to, nor integral to the Amended Complaint; thus, the Court will not

consider it in deciding the instant motions to dismiss.

**21.** "The provisions of TILA are applicable to creditors." *Johnson v. Scala*, No. 05–CV–5529, 2007 WL 2852758, at *3 (S.D.N.Y. Oct. 1, 2007). Accordingly, Plaintiffs must allege that the Defendants accused of violating TILA are creditors and thus subject to TILA. A

### 1. Rescission

Plaintiffs seek rescission under 15 U.S.C. § 1635, which states that:

> [e]xcept as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter
> . . . .

15 U.S.C. § 1635(a). In addition to these requirements, the creditor is required to "clearly and conspicuously disclose" this rescission right. *Id.* However, certain types of transactions are specifically exempted from this right of rescission, including "a residential mortgage transaction." *Id.* § 1635(e)(1); *see also Ng v. HSBC Mortg. Corp.*, No. 07–CV–5434, 2010 WL 889256, at *2 (E.D.N.Y. Mar. 10, 2010) (noting that § 1635(a) "is wholly inapplicable in the context of residential mortgages"); *Eubanks v. Liberty Mortg. Banking Ltd.*, 976 F.Supp. 171, 174 (E.D.N.Y.1997) ("Rescission is not an available remedy for residential mortgages."). A residential mortgage transaction is defined as one in which "a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." 15 U.S.C. § 1602(w); *see also Ng*, 2010 WL 889256, at *8.

■ Plaintiffs allege that they never received the required rescission notices from Defendants, and therefore claim that they are now entitled to rescind the transaction. Defendants Fremont and U.S. Bank, however, assert that pursuant to § 1635(e), Plaintiffs' had no right to rescind this transaction, and accordingly, Defendants were not required to provide notice of a right to rescind. (Mem. of Law in Supp. of Defs. Fremont Reorganizing Corporation f/k/a Fremont Investment & Loan, and Fremont General Corporation's Mot. to Dismiss the Compl. Pursuant to Fed. R.Civ.P. 12(b)(6) and 11 U.S.C. 362(a) ("Fremont Mem.") ¶ 30; Mem. of Law. in Supp. of Mot. to Dismiss the Am. Compl. Against Def. U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006–FRE–1 ("U.S. Bank Mem.") 16–17.)

The Court finds that the Amended Complaint and attached documents undisputedly establish that the funds Plaintiffs received from Fremont were used to finance the acquisition of the Newburgh home, and

---

"creditor" is defined as a person who "regularly extends . . . consumer credit," and "is the person to whom the debt arising from the consumer credit transaction is initially payable." 15 U.S.C. § 1602(f); *see also* 12 C.F.R. § 226.2(a)(17) ("Creditor means: (i)[a] person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments . . ., and to whom the obligation is initially payable . . . ." (footnote omitted)). Here, Plaintiffs have only alleged

that FIL is a creditor (Am. Compl. ¶ 388), and WCS correctly argues that in fact it is not a creditor, and thus cannot be liable under TILA, (Def. WCS Lending, LLC's Mem. of Law in Supp. of Mot. to Dismiss Pls.' Am. Compl. ("WCS Mem.") 15). Indeed, "numerous courts have held that mortgage brokers are not creditors under TILA." *Mauro v. Countrywide Home Loans, Inc.*, 727 F.Supp.2d 145, 157 n. 13 (E.D.N.Y.2010) (collecting cases).

that Plaintiffs planned to, and did, use the home as their dwelling. As such, this was a residential mortgage transaction, and Plaintiffs have no right to rescission. *See Ng*, 2010 WL 889256, at *8 (concluding that § 1635 was inapplicable to a transaction that "clearly qualifies as a 'residential mortgage transaction'" because "it [was] undisputed that the two mortgages entered into by [the plaintiff] allowed him to purchase the property in question[,] [where] ... the complaint asserts [both] that the plaintiff resides at the property that is the subject of the mortgages here, and ... that the mortgage loans were used to purchase that property"); *see also Nembhard v. Citibank, N.A.*, No. 96–CV–3330, 1996 WL 622197, at *2 (E.D.N.Y. Oct. 22, 1996) (noting that "[s]ince the complaint itself and the loan documents submitted as exhibits to the complaint unambiguously state that the funds were used to finance the acquisition of the home ... to be occupied by the plaintiff," there is no right of rescission under TILA). Thus, Defendants were not required to provide notice of a right to rescission, and their alleged failure to do so was not a TILA violation. *See Allah v. New Century Mortg. Corp.*, No. 06–CV–3031, 2006 WL 3196851, at *3 (E.D.N.Y. Nov. 4, 2006) (concluding that because the transaction was a residential mortgage, the plaintiff could "prove no set of facts that entitle him to relief under [TILA] for [the defendant's] failure to disclose a right to rescind").

### 2. Damages

The Moving Defendants also argue that Plaintiffs' claim for monetary damages under TILA is time-barred. (Fremont Mem. ¶ 29; U.S. Bank Mem. 14–15; Def. WCS Lending, LLC's Mem. of Law in Supp. of Mot. to Dismiss Pls.' Am. Compl. ("WCS Mem.") 13–14.) Private actions for damages based on TILA violations are subject to a one-year statute of limitations. *See Johnson v. Scala*, No. 05–CV–5529, 2007 WL 2852758, at *3 (S.D.N.Y. Oct. 1, 2007); *see also* 15 U.S.C. § 1640(e) ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."); *McAnaney v. Astoria Fin. Corp.*, No. 04–CV–1101, 2007 WL 2702348, at *12 (E.D.N.Y. Sept. 12, 2007) ("[T]he plain language of Section 1640(e) and the cases interpreting that statute indicate that, where a damages claim under TILA is time-barred, the Court is prohibited from even reaching the question of whether the defendant has violated TILA."). "It is well-settled law that in 'closed-end credit' transactions, like the one at issue, the 'date of the occurrence of [the] violation' is no later than the date the plaintiff enters the loan agreement, or possibly, when defendant performs by transmitting the funds to plaintiffs." *Cardiello v. Money Store, Inc.*, No. 00–CV–7332, 2001 WL 604007, at *3 (S.D.N.Y. June 1, 2001) (footnote omitted) (quoting 15 U.S.C. § 1640(e)) (collecting cases), *aff'd*, 29 Fed.Appx. 780 (2d Cir. 2002); *see also Johnson*, 2007 WL 2852758, at *3 ("Case law supports the notion that the statute of limitations for TILA claims does not start running upon the discovery of the non-disclosure, but, rather, upon the funding of the loan.").[22]

---

**22.** "A closed-end credit transaction is one where the finance charge is divided into the term of the loan and incorporated into time payments, and includes a completed loan such as a mortgage or car loan." *McAnaney v. Astoria Fin. Corp.*, No. 04–CV–1101, 2008 WL 222524, at *4 (E.D.N.Y. Jan. 25, 2008) (internal quotation marks omitted). "By contrast, an 'open-end' credit transaction is one in which 'the creditor reasonably contemplates repeated transactions, ... and ... provides for a finance charge which may be

Here, it is undisputed that the mortgage loan transactions closed on October 12, 2005. (Am. Compl. ¶ 73.) Thus, the applicable statute of limitations ran on October 12, 2006, over a year before Plaintiffs initiated this action by filing the initial Complaint on January 31, 2008. (Dkt. No. 1.)

■ Plaintiffs assert that the limitations period for their TILA claims should be tolled, arguing "that because of the fraudulent concealment of material facts, they were prevented from learning about the misconduct(s) by WCS and Fremont and the forged documents in Fremont's underwriting loan files until March 30, 2007." (Pls.' Mem. of Law in Opp'n to Defs., Fremont Reorganizing Corporation f/k/a/ Fremont Investment and Loan and Fremont General Corporation's Mot. to Dismiss the Am. Compl. ("Pl. Opp'n to Fremont") at unnumbered page 9.) Plaintiffs also claim that they "allege that [D]efendants deceptively concealed its [sic] violations, and therefore, the equitable tolling doctrine should apply." (Pls.' Mem. of Law in Opp'n to Def., WCS Lending, LLC's Mot. to Dismiss the Am. Compl. ("Pl. Opp'n to WCS") 13.)

■ "Equitable tolling is available in 'rare and exceptional circumstances,' where the court finds that 'extraordinary circumstances' prevented the party from timely performing a required act, and that the party 'acted with reasonable diligence throughout the period he sought to toll.'" *Williams v. Aries Fin., LLC,* No. 09–CV–1816, 2009 WL 3851675, at *6 (E.D.N.Y. Nov. 18, 2009) (alterations omitted) (quoting *Walker v. Jastremski,* 430 F.3d 560, 563 (2d Cir.2005)); *see also Cardiello,* 2001 WL 604007, at *4 (explaining that equitable tolling may supersede an expired stat-

ute of limitations where a plaintiff establishes "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the applicable statutory period] of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part" (internal quotation marks omitted)). "Stated differently, equitable tolling is permitted where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Coveal v. Consumer Home Mortg., Inc.,* No. 04–CV–4755, 2005 WL 704835, at *4 (E.D.N.Y. Mar. 29, 2005) (internal quotation marks omitted); *see also Williams,* 2009 WL 3851675, at *6 ("The Second Circuit has held that equitable tolling is appropriate 'where the defendant is responsible for concealing the existence of plaintiff's cause of action.'" (alterations omitted) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund,* 393 F.3d 318, 322 (2d Cir.2004))). Thus, "[i]n cases involving TILA, 'the courts have held uniformly that fraudulent conduct *beyond the nondisclosure itself is* necessary to equitably toll the running of the statute of limitations[,]' . . . because if the very nondisclosure or misrepresentation that gave rise to the TILA violation also tolled the statute of limitations, the effect of the statute of limitations would be nullified." *Cardiello,* 2001 WL 604007, at *5 (emphasis added) (citations omitted) (quoting *Pettola v. Nissan Motor Acceptance Corp.,* 44 F.Supp.2d 442, 450 (D.Conn.1999)); *see also Jones v. Saxon Mortg., Inc.,* 980 F.Supp. 842, 846 (E.D.Va. 1997) ("[F]raudulent concealment requires some act in addition to the commission of the initial fraudulent act because it implies conduct affirmatively directed at deflecting

computed from time to time on the outstanding unpaid balance,'" such as a credit card.

*Id.* (quoting 15 U.S.C. § 1602(i)).

litigation." (alteration and internal quotation marks omitted)).

Here, although Plaintiffs state in their opposition to WCS's motion that Defendants concealed their violations (Pl. Opp'n to WCS 13)—as opposed to just the original nondisclosures—this is not alleged in the Amended Complaint; nor do Plaintiffs specify which Defendants concealed the violations, or how they were concealed. The Amended Complaint does state that Plaintiffs did not discover the forged and falsified documents until March 7, 2007, when either WCS or Fremont allegedly submitted the documents to the New York State Banking Department in response to complaints Plaintiffs filed with various federal and state regulatory agencies. (Am. Compl. ¶¶ 287, 392, 397.) However, Plaintiffs do not allege that Defendants did anything to fraudulently conceal these documents, or the other purported TILA-violating nondisclosures, from Plaintiffs.[23] To warrant equitable tolling, Plaintiffs must plead that Defendants took some action to conceal the TILA violations during the one-year applicable statutory period following the consummation of the loan on October 12, 2005. *See McAnaney,* 2007 WL 2702348, at *7. The Amended Complaint fails to do so. Therefore, "Plaintiffs fail to satisfy their pleading burden to allege efforts by [ ][D]efendants, above and beyond the wrongdoing upon which [P]laintiffs' claim is founded, to prevent, by fraud or deception, [ ][P]laintiffs from suing in time." *Coveal,* 2005 WL 704835, at *5 (alterations and internal quotation marks omitted); *see also Williams,* 2009 WL 3851675, at *7 (declining to apply equitable tolling where the acts of concealment alleged by the plaintiff were the same acts that the plaintiff alleged were the underlying TILA violations).

In addition, despite Plaintiffs' assertion that they did not learn of the fraudulent documents until either March 7, 2007 (Am Compl. ¶ 392), or March 30, 2007 (Pl. Opp'n to Fremont at unnumbered page 9), Plaintiffs submitted a letter to ASC on December 28, 2006, attempting to rescind the loan transaction due to TILA violations, (Compl. Ex. 8, at unnumbered page 1). Plaintiffs also submitted a letter to New York's Banking Department, Office of the Attorney General, and other agencies on January 8, 2007, stating that the purpose of the letter was "to file a formal and official complaint" against WCS, Fremont, and U.S. Bank, for violations of HOEPA, TILA, and RESPA, and specifically asserting that Fremont and WCS submitted false documentation. (*Id.* Ex. 10, at unnumbered pages 21–23.) These letters demonstrate that Plaintiffs were aware of potential TILA violations more that a year prior to filing their initial Complaint in this case.[24] Thus, Plaintiffs have not currently pled facts that would entitle them to equitable tolling, and the statute of limitations bars their claim for monetary damages under TILA. *See Coveal,* 2005 WL 704835, at *7 (dismissing TILA claim where the plaintiffs filed their complaint more than a year after a state court action demonstrated their awareness of their federal claim); *Van Pier v. Long Island Sav. Bank,* 20 F.Supp.2d 535, 536 (S.D.N.Y.1998) (con-

---

**23.** In addition, even if Plaintiffs did not see these particular documents until March 7, 2007, that does not change the fact that Plaintiffs were clearly advised of, and aware of, the loan terms at issue by October 12, 2005.

**24.** Moreover, Plaintiffs received a reply from the New York State Office of the Attorney General, dated January 16, 2007, which explicitly states in bold, italicized type that the complaint submitted to the office has no effect on any statute of limitations that might apply to the claim. (Compl. Ex. 10, at unnumbered page 53.)

cluding that equitable tolling was unavailable, despite the plaintiff's claim that the defendants fraudulently concealed their TILA violations, because the plaintiff filed a state court complaint alleging TILA violations over a year before he filed his federal court action).[25]

Accordingly, Plaintiffs' claims for rescission and damages pursuant to TILA are dismissed with prejudice.[26]

### C. HOEPA Claim

 Plaintiffs' twelfth cause of action, which is brought against all of the Moving Defendants, alleges HOEPA violations. (Am Compl. ¶ 408.) U.S. Bank argues that Plaintiffs' mortgage is not a loan governed by HOEPA. (U.S. Bank Mem. 16.) This assertion is correct. "[A] HOEPA loan is defined under 15 U.S.C. § 1602(aa) as a mortgage that is a 'consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction ....'" Johnson, 2007 WL 2852758, at *4 (quoting 15 U.S.C. § 1602(aa)) (concluding that HOEPA did not apply because the loan at issue was a purchase money mortgage loan and not a second loan or refinancing); see also Campanella v. Aurora Loan Servicing, No. 10–CV–684, 2010 WL 5315963, at *3 (N.D.N.Y. Dec. 20, 2010) ("HOEPA ... is not applicable as this was not a refinance transaction."); McAnaney v. Astoria Fin. Corp., 665 F.Supp.2d 132, 155 (E.D.N.Y. 2009) ("The statutory definition of HOEPA-covered mortgages includes loans that are secured by a consumer's principal dwelling, but specifically carves out residential mortgage transactions under its plain terms."); Nelson v. JPMorgan Chase Bank, N.A., 707 F.Supp.2d 309, 312 n. 4 (E.D.N.Y.2009) ("HOEPA does not apply to principal residential mortgages."). Accordingly, because Plaintiffs' loans are residential mortgages, they are not covered by HOEPA, and this claim is dismissed with prejudice.[27]

25. Plaintiffs also argue that their TILA claim is timely because "the damages sought in the [A]mended [C]omplaint are defensive in nature because they are in the nature of recoupment against Fremont's proof of claim." (Pls.' Mem. of Law in Opp'n to Defs., U.S. Bank, N.A. as Trustee for the Master Asset Backed Securities Trust 2006–FRE–1 Mot. to Dismiss the Am. Compl. at unnumbered pages 14–15.) Plaintiffs correctly note that, even after the one-year limitations period has expired, a debtor is not barred from asserting a TILA violation "in an action to collect the debt ... as a matter of defense by recoupment or set-off in such action." 15 U.S.C. § 1640(e). However, this provision is inapplicable here. Despite Plaintiffs' statement to the contrary, they are not asserting their TILA claim defensively, such as in a foreclosure action; but rather affirmatively, in an action that they commenced for damages. Thus, the recoupment exception does not save their untimely TILA claim. See Moor v. Travelers Ins. Co., 784 F.2d 632, 634 (5th Cir.1986) ("When the debtor hales the creditor into court, ... the claim by the debtor is affirmative rather than defensive."); Van Pier, 20 F.Supp.2d at 536 (rejecting similar claim where the plaintiff had asserted a claim for TILA damages "affirmatively" and not "as a defense in an action to collect debt" (internal quotation marks omitted)).

26. Here, the December 28, 2006 and January 8, 2007 letters make amendment futile, because they demonstrate that Plaintiffs were aware of potential TILA violations more than a year before they filed this action.

27. In addition, "'HOEPA ... is part of TILA, and as such, is barred by the same statute of limitations discussed above with respect to Plaintiff[s'] TILA claim.'" Done v. HSBC Bank USA, No. 09–CV–4878, 2010 WL 3824146, at *4 (E.D.N.Y. July 19, 2010) (quoting Johnson, 2007 WL 2852758, at *4); see also Campanella, 2010 WL 5315963, at *3 ("HOEPA is an amendment to TILA, and therefore governed by the same statute of limitations."). Plaintiffs' HOEPA claim was filed well over a year after the one-year statute of limitations period had run, and for the same reasons discussed above with respect to their TILA claim, Plaintiffs have not pled facts

## D. RESPA

Plaintiffs' sixteenth cause of action, brought against all of the Moving Defendants, alleges RESPA violations. Congress enacted RESPA "to effect certain changes in the settlement process for residential real estate that will result," inter alia, "in more effective advance disclosure to home buyers and sellers of settlement costs" and "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b). Plaintiffs allege that WCS and Fremont violated RESPA by (1) "giving or accepting kickbacks or other things of value in violation of 12 U.S.C. § 2607(a)," and (2) "giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(b)." (Am. Compl. ¶ 514.)

 The Moving Defendants argue that Plaintiffs' RESPA claim also is time-barred. (Fremont Mem. ¶ 32; WCS Mem. 18; U.S. Bank Mem. 19.) "Violations of Section 2607 of RESPA are subject to a one-year statute of limitations from the date of the occurrence of the violation." *Done v. HSBC Bank USA*, No. 09–CV–4878, 2010 WL 3824146, at *4 (E.D.N.Y. July 19, 2010); *see also* 12 U.S.C. § 2614 (establishing one-year statute of limitations for violations of § 2607). Thus, the statute of limitations expired on October 12, 2006. Plaintiffs argue that their RESPA claim is in the nature of recoupment, and thus excepted from the one-year statute of limitation mandated by § 2614. (Pls.' Mem. of Law in Opp'n to Defs., U.S. Bank, N.A. as Trustee for the Master Asset Backed Securities Trust 2006–FRE–1 Mot. to Dismiss the Am. Compl. at unnumbered page 17.) However, as discussed *supra* note 25, Plaintiffs are asserting their RESPA claim affirmatively in this action; thus any potential claim of defensive recoupment is inapplicable. In addition, even drawing all inferences in Plaintiffs' favor, Plaintiffs have not stated any facts that would justify tolling the statute.[28] Plaintiffs have not pled that they were unaware of their RESPA cause of action within the statutory period, let alone that Defendants concealed its existence. Moreover, Plaintiffs' January 8, 2007 letter to the state and federal agencies clearly indicates that Plaintiffs were aware of a purported RESPA violation more than a year prior to commencing this action. (Compl. Ex. 10, at unnumbered page 21.) Accordingly, Plaintiffs' RESPA claim is also time-barred, and must be dismissed with prejudice.[29]

## E. FHA Claim

Plaintiffs' eighteenth cause of action, brought against all of the Moving Defendants, alleges violations of the FHA, which provides that "it shall be unlawful ... [t]o discriminate against any person in the

in their Amended Complaint that would warrant equitable tolling. Accordingly, even if HOEPA applied to Plaintiffs' loans, their claim would be time-barred.

28. In their papers opposing the Moving Defendants' motions to dismiss, Plaintiffs address their equitable tolling argument only to their TILA claim; they do not specifically assert that their RESPA claim is subject to equitable tolling. However, in light of Plain-

tiffs' pro se status, the Court has still considered whether equitable tolling could apply to their RESPA claim.

29. As discussed with respect to Plaintiffs' TILA damages claim, amendment would be futile given the existence of the January 8, 2007 letter demonstrating Plaintiffs' knowledge of an alleged RESPA violation more than a year before they filed this action.

terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race ...." 42 U.S.C. § 3604(b). In addition, "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person ... in the terms or conditions of such a transaction, because of race .... *Id.* § 3605(a). A "residential real estate-related transaction" means "(1) [t]he making or purchasing of loans or providing other financing assistance [ ] for purchasing ... a dwelling ... [or] (2)[t]he selling, brokering, or appraising of residential real property." *Id.* § 3605(b).

Plaintiffs allege that Fremont and WCS "targeted African–Americans for higher cost subprime mortgage loans, while directing Caucasian applicants, with the same qualifications after accounting for risk, into lower cost loans," and that Plaintiffs themselves were targeted as part of this scheme. (Am. Compl. ¶¶ 556, 558.) Plaintiffs claim that Fremont and WCS "engaged in a pattern or practice of discrimination" based on race, or that, alternatively, their facially neutral policies "had a discriminatory effect and created statistical disparities," which will continue to have a disparate impact on other African–Americans. (*Id.* ¶¶ 559–60, 564.) Plaintiffs further allege that "Defendants intentionally provid[ed] Plaintiffs with grossly inferior terms, conditions, and/or privileges of services in connection with the financing transaction on the basis of race and color." (*Id.* ¶ 568.) [30]

Defendants argue that Plaintiffs' FHA claim also must be dismissed as time-barred. (WCS Mem. 19; U.S. Bank Mem. 21.) Claims brought pursuant to the FHA are subject to a two-year statute of limitations. 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action ... not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."); *see also Williams v. N.Y.C. Hous. Auth.,* No. 07–CV–7587, 2009 WL 804137, at *5 (S.D.N.Y. Mar. 26, 2009) ("The statute of limitations for private causes of action under the FHAA is two years."). According to U.S. Bank, "the Fair Housing Act allegations in the Amended Complaint are solely predicated on the acts of WCS, Fremont, and Tanenbaum in making and funding the loan, which closed on October 12, 2005." (U.S. Bank Mem. 21; *see also* WCS Mem. 20 (stating that the Amended Complaint does not allege that any purported acts of discrimination occurred after October 12, 2005, when the transaction closed).) Indeed, Plaintiffs' claim that Defendants intentionally provided them with an unfair loan because of their race is based on conduct that, with respect to Plaintiffs, undoubtedly concluded with the close of the transaction on October 12, 2005.[31]

Thus, the limitations period for this claim expired on October 12, 2007, approximately three-and-a-half months before Plaintiffs filed this action. *See Davenport v. Litton Loan Servicing, LP,* 725 F.Supp.2d 862, 875 (N.D.Cal.2010) (dismissing FHA claim as untimely where the plaintiff had not alleged any unlawful con-

---

**30.** The Amended Complaint also contains a few references to discrimination based on gender. (Am. Compl. ¶¶ 559, 563, 567, 576, 582, 591.) However, Plaintiffs plead no facts suggesting gender discrimination, and focus their pleadings on racial discrimination.

**31.** Because Plaintiffs fail to allege *any* discriminatory conduct by U.S. Bank, this cause of action is dismissed as to U.S. Bank on this ground, independent of the statute of limitation grounds discussed below.

duct after the origination and culmination of her loan, which occurred more than two years prior to her filing her complaint); *Phan v. Accredited Home Lenders Holding Co.,* No. 09–CV–328, 2010 WL 1268013, at *3 (M.D.Fla. Mar. 29, 2010) (dismissing FHA claim as time-barred because it was based on alleged "discrimination [that] occurred at or before loan origination," two-and-a-half years before the complaint was filed); *Goodwin v. Exec. Tr. Servs., LLC,* 680 F.Supp.2d 1244, 1251 (D.Nev.2010) (dismissing FHA claim where "[t]he conduct giving rise to [the] claim [was] the issuance of a 'less-than-favorable loan,'" and the statute of limitations began running on the date the plaintiff executed the deed of trust, more than two years before she initiated the action); *Pantoja v. Scott,* No. 96–CV–8593, 2001 WL 1313358, at *9 (S.D.N.Y. Oct. 26, 2001) (where the plaintiff's FHA claim alleged a discriminatory failure to provide secondary financing, the plaintiff had until two years after the date of closing to initiate his suit). In their opposition papers to the motions to dismiss, Plaintiffs failed to address any of the Moving Defendants' arguments in support of dismissal of the FHA claim.[32] However, given Plaintiffs' pro se status, the Court has still assessed whether Plaintiffs' FHA claim could be considered timely under any applicable doctrine, but concludes that no such doctrine helps Plaintiffs in this instance.

▌ First, equitable tolling cannot apply here. As already discussed, to toll a limitations period, a plaintiff must allege that the defendant concealed the cause of action's existence, and that the plaintiff remained unaware of it until some point within the applicable statutory period of commencing the action. *See Cardiello,* 2001 WL 604007, at *4. Pursuant to Federal Rule of Civil Procedure 9(b), these elements of fraudulent concealment must be pled with particularity. *See Armstrong v. McAlpin,* 699 F.2d 79, 88 (2nd Cir.1983) ("Appellants' generalized and conclusory allegations of fraudulent concealment do not satisfy the requirements of Fed. R.Civ.P. 9(b)."); *Fezzani v. Bear, Stearns & Co.,* No. 99–CV–793, 2005 WL 500377, at *8 (S.D.N.Y. Mar. 2, 2005) ("Courts have held that Rule 9(b) applies to … fraudulent concealment to toll the statute of limitations." (internal citations omitted)). Here, Plaintiffs have not alleged that the Moving Defendants concealed Plaintiffs' FHA claim from them during the applicable statute of limitations; nor does the Amended Complaint indicate when Plaintiffs first became aware of their FHA claim. *See Barkley v. Olympia Mortg. Co.,* No. 04–CV–875, 2007 WL 2437810, at *17 (E.D.N.Y. Aug. 22, 2007) ("[T]he [c]ourt cannot conclude that equitable tolling applies in this instance, since plaintiffs do not identify the date or dates by which they knew about their Fair Housing Act claims.").

▌ Second, the continuing violation doctrine is also inapplicable. "The 'continuing violation' doctrine applies when a plaintiff challenges 'not just one incident of

---

**32.** The Moving Defendants argued that Plaintiffs' FHA claim should be dismissed both on statute of limitations grounds, and on the merits. Plaintiffs responded to neither argument in any of their three opposition briefs. In fact, Plaintiffs' opposition papers fail to address, or even mention, their race discrimination claims brought pursuant to the FHA, the ECOA, and the Civil Rights Act, or Defendants' asserted grounds for dismissal of those claims, in any way whatsoever. In similar situations, courts have deemed such claims to be abandoned and dismissed them accordingly. *See Done,* 2010 WL 3824146, at *3 n. 5 (collecting cases). However, in light of Plaintiffs' pro se status, and the considerable amount of pages devoted to these claims in the Amended Complaint, the Court will still examine these causes of action to see if any should survive the instant motions to dismiss.

conduct violative of the Act, but an unlawful practice that continues into the limitations period.'" *Shelter Inc. Realty v. City of New York*, No. 01–CV–7015, 2007 WL 29380, at *12 (E.D.N.Y. Jan. 4, 2007) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Where it applies, the doctrine delays "the commencement of the statute of limitations period ... until the last discriminatory act in furtherance of" the alleged discriminatory policy. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir.2009) (internal quotation marks omitted). However, courts in the Second Circuit "have been loath to apply [the continuing violation doctrine] absent a showing of compelling circumstances." *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F.Supp.2d 151, 165 n. 11 (S.D.N.Y.2006) (internal quotation marks omitted).

■ Here, the Amended Complaint refers to a "pattern or practice of discrimination on the basis on [sic] race" (Am. Compl. ¶ 559), asserts that WCS "routinely target[ed] its fraudulent activities to members of African–American communities" (*id.* ¶ 540), and alleges that "Fremont continue [sic] to provide mortgage loans to Caucasian applicants with similar qualifications on significantly more favorable terms," (*id.* ¶ 564). However, these statements, culled together, are insufficient to plead a continuing violation. Plaintiffs allege no act, taken against them by any Defendant after October 12, 2005, that could state a claim under the FHA. Moreover, Plaintiffs have failed to allege *facts* (as opposed to conclusory legal claims) establishing that any Defendant had a specific discriminatory policy that violates the

FHA, or directed acts towards any specified person other than Plaintiffs, that violated the FHA. The Amended Complaint includes detailed statistics and research regarding purported systematic racial discrimination in lending practices. (*Id.* ¶¶ 5–7, 11–14.) Yet, it does not contain allegations against these specific Defendants that would justify applying the continuing violation doctrine.

■ The courts that have found a continuing violation of the FHA have done so in cases involving multiple plaintiffs alleging multiple, specific, and ongoing acts of discrimination, on specific dates, as opposed to general assertions that the defendants engaged in discriminatory practices, as the Plaintiffs have pleaded in the present action. *See, e.g., Barkley*, 2007 WL 2437810, at *16 (applying the continuing violation doctrine where the plaintiffs based their allegations on a review of the properties sold by the defendants during the statutory period). Conversely, vague or conclusory claims regularly meet dismissal. *See, e.g., Shelter*, 2007 WL 29380, at *12 (continuing violation doctrine inapplicable where "plaintiffs have only made vague and unsubstantiated blanket accusations regarding these assertions"); *Pantoja*, 2001 WL 1313358, at *10–11 (declining to apply continuing violation doctrine where the plaintiff had not specifically alleged that the defendant denied secondary financing to him or to other Hispanics after the statute of limitations date). Thus, as currently pled, the Amended Complaint fails to allege a continuing violation of the FHA. Plaintiffs' FHA claim is therefore untimely, and accordingly is dismissed with prejudice.[33]

---

**33.** Even if Plaintiffs' FHA claim was not time-barred, it also suffers from serious deficiencies on the merits. Plaintiffs' FHA claim is based on a theory of reverse redlining, which "occurs when a lender unlawfully discriminates by extending credit to a neighborhood or class of people (typically living in the same neighborhood) on terms less favorable than would have been extended to people outside the particular class at issue." *Wiltshire v.*

## F. ECOA Claim

In their nineteenth cause of action, Plaintiffs allege that the Moving Defendants violated the ECOA, which makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [ ] on the basis of race . . . ." 15 U.S.C. § 1691(a)(1).[34] Plaintiffs allege that Fremont and WCS violated ECOA by "knowingly targeting members of Plaintiffs' race and gender, and steering them to the extension of mortgage financing in a principal amount known to exceed the fair market value of the property, on terms that are onerous to the borrower, but highly profitable to the Defendants," thereby inducing Plaintiffs to enter into unfair mortgage loans. (Am. Compl. ¶¶ 582–83.) Plaintiffs also allege that they "were systematically and continuously extend [sic]

mortgage credit by Defendants on a discriminatory basis," citing the Order to Cease and Desist Fremont received from the FDIC on March 7, 2007 (id. ¶ 597), and claim that Fremont and WCS "will continue to engage in conduct that disregards the rights of African–Americans," (id. ¶ 598).[35]

Defendants argue that Plaintiffs' ECOA claim is also time-barred. (WCS Mem. 21; U.S. Bank Mem. 25.) The ECOA provides that no private action "shall be brought later than two years from the date of the occurrence of the violation." 15 U.S.C. § 1691e(f); see also Coveal, 2005 WL 704835, at *3 ("A two-year statute of limitations governs ECOA claims."). Again, in the absence of some exception, this means that Plaintiffs' claims are time-barred. Plaintiffs have not responded to these ar-

---

Dhanraj, 421 F.Supp.2d 544, 554 (E.D.N.Y. 2005) (internal quotation marks omitted). To state a claim for reverse redlining, Plaintiffs must allege, inter alia, that "they applied for and were qualified for fairly administered loans," Barkley, 2007 WL 2437810, at *15, and that the lender continued to provide "significantly more favorable" loans to other similarly-qualified non-African American applicants, Wiltshire, 421 F.Supp.2d at 554, through either intentional targeting or disparate treatment, see Williams v. 2000 Homes Inc., No. 09–CV–16, 2009 WL 2252528, at *5 (E.D.N.Y. July 29, 2009).

Here, Plaintiffs have not alleged that they were qualified for a fairly-administered loan; instead they admit that their initial mortgage financing application was denied by Washington Mutual. (Am. Compl. ¶ 139.) In addition, Plaintiffs assert that WCS targeted African–Americans, but provide no facts indicating how this targeting was conducted—in contrast to properly-pled reverse redlining claims, where the complaint contained detailed allegations of targeting by advertising and minority-focused outreach. See Barkley, 2007 WL 2437810, at *12. Plaintiffs' allegations of disparate treatment are also very generalized, as they fail to plead that any specific similarly-situated non-African American applicant received a

better loan. See Ng, 2010 WL 889256, at *11–12 (dismissing reverse redlining claim because the facts were "alleged in far too conclusory a fashion to satisfy the current pleading requirements" of Iqbal and Twombly and "the claims [we]re alleged with little more than buzzwords and conclusory labels, in the absence of the requisite factual allegations"); Williams, 2009 WL 2252528, at *5 (allegations that the plaintiff was induced to sign less favorable loans than those given to Caucasians, and that the defendants targeted him as part of this scheme based on his race and engaged in a practice that had a disparate impact to the detriment of non-white buyers, were too conclusory to state a plausible FHA claim under Iqbal ).

34. The Amended Complaint actually does not list WCS as a party against which this cause of action is asserted, but given that the paragraphs included under this cause of action mention WCS extensively, the Court assumes that this was an oversight by Plaintiffs. Indeed, WCS has addressed Plaintiffs' ECOA claim in its motion to dismiss.

35. As previously mentioned, Plaintiffs fail to allege any discriminatory conduct by U.S. Bank; accordingly, the ECOA claim is dismissed as to U.S. Bank on that ground alone.

guments in their opposition papers, but the Court again considers whether the Amended Complaint establishes that either the continuing violation or equitable tolling doctrines should apply here, and concludes that they are inapplicable.

Plaintiffs have failed to establish that equitable tolling is justified here. As previously discussed, for equitable tolling to apply, Plaintiffs must plead that Defendants concealed from Plaintiffs the existence of their ECOA cause of action. *See Cardiello*, 2001 WL 604007, at *4. Plaintiffs have not alleged any such acts by any Defendant here. *See Coveal*, 2005 WL 704835, at *5 (declining to toll statute of limitations for ECOA claim, where the "[p]laintiffs fail[ed] to satisfy their pleading burden to allege efforts by the defendants, above and beyond the wrongdoing upon which plaintiffs' claim is founded, to prevent, by fraud or deception, the plaintiffs from suing in time" (alterations and internal quotation marks omitted)). Further, to toll the limitations period, Plaintiffs must allege that they did not learn of their ECOA cause of action until some point within the applicable statutory period (here, two years) before they commenced their action. *See Cardiello*, 2001 WL

604007, at *4. Here, Plaintiffs have failed to allege when they became aware of their ECOA claim; thus, the Court is unable to conclude that equitable tolling is appropriate. *See Trakansook v. Astoria Fed. Savs. & Loan Ass'n*, No. 06–CV–1640, 2007 WL 1160433, at *10 (E.D.N.Y. Apr. 18, 2007) (concluding that the limitations period could not be tolled where the plaintiff had "pointed to no event within the limitations period that first led her to believe [the defendant's] actions were discriminatory"); *Coveal*, 2005 WL 704835, at *7 (concluding that a claim was untimely, despite the plaintiffs' assertion in a legal memorandum that they were unaware of their ECOA claim until they met with lawyers, because such allegations must be pled in the complaint); *cf. Phillips v. Better Homes Depot, Inc.*, No. 02–CV–1168, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003) (finding that equitable tolling was warranted where the plaintiff alleged that she did not become aware that she was discriminated against until she met with an attorney on a specified date less than two years before she filed her complaint); *Jones v. Ford Motor Credit Co.*, No. 00–CV–8330, 2002 WL 88431, at *5 (S.D.N.Y. Jan. 22, 2002) (same).[36]

**36.** The *Trakansook* court noted that "[s]ome district courts have applied the 'federal discovery rule' to ECOA claims." *Trakansook*, 2007 WL 1160433, at *10 (citing *Jones v. Ford Motor Credit Co.*, No. 00–CV–8330, 2002 WL 88431, at *4–5 (S.D.N.Y. Jan. 22, 2002)). This rule tolls the statute of limitations "where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, ... [and where it applies] accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause." *Thompson v. Metro. Life Ins. Co.*, 149 F.Supp.2d 38, 48 (S.D.N.Y.2001) (internal quotation marks omitted). "Courts have relied on the federal discovery rule in ECOA cases for the proposition that the statute of limitations runs from the time that a plaintiff knew or should have

known that it was being discriminated against on the basis of race." *AMS Grp. v. JP Morgan Chase Bank*, No. 07–CV–6988, 2008 WL 3833848, at *3 (S.D.N.Y. Aug. 15, 2008). However, the *Trakansook* court observed that in *TRW, Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), the Supreme Court "declined to adopt a discovery accrual rule generally applicable to all federal claims, and held instead that whether a limitations period may be tolled until a plaintiff has or should have discovered his injury is a matter of statutory construction," and specifically held that the discovery rule generally does not apply to claims brought under the Fair Credit Reporting Act ("FCRA"). *Trakansook*, 2007 WL 1160433, at *10 (citing *TRW*, 534 U.S. at 27–29, 122 S.Ct. 441). Because the plaintiff in *Trakansook* did not invoke this

■ In addition, for the same reasons set forth with respect to their FHA claim, Plaintiffs have not pled a continuing violation of the ECOA. Plaintiffs allege that they were systematically and continuously extended credit on a discriminatory basis, yet they have not pled any act, taken by any Defendant, after the credit transaction closed on October 12, 2005. Moreover, although Plaintiffs do seem to allege that Defendants have discriminated against other African–Americans as well, that is insufficient to establish a continuing violation, where Plaintiffs have alleged no specific instances of other discriminatory acts, nor dates on which this conduct purportedly began or concluded. *See Phillips*, 2003 WL 25867736, at *24 (rejecting the plaintiff's argument that a continuing violation existed "because defendants continued to target minorities after it [sic] discriminated against her," because the plaintiff made no allegation that these other victims and discriminatory conduct were related to her or her action).[37]

Accordingly, the Court concludes that Plaintiffs' ECOA claim is untimely, and must be dismissed as against all Defendants with prejudice.[38]

### G. Civil Rights Act Claims

■ Plaintiffs' twentieth cause of action asserts violations of 42 U.S.C. §§ 1981, 1982, and 1985(3) against all of the Moving Defendants. These claims are subject to a three-year statute of limitations, and accordingly, are timely. *See Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam). "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts . . .)." *Id.* Similarly, "[t]o maintain an action under § 1982, a plaintiff must allege that she was [intentionally] deprived of a property right because of her race." *Harary v. Allstate Ins. Co.*, 983 F.Supp. 95, 99 (E.D.N.Y. 1997); *see also Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F.Supp. 673, 700 (S.D.N.Y.1996) (noting that a § 1982 plaintiff must allege facts demonstrating, inter alia, that "the discrimination concerned one or more activities enumerated in

rule or specify when she discovered the alleged discrimination, the court did not reach this issue, but did "note that the ECOA and FCRA statutes are arguably similar with respect to the factors analyzed in *TRW*." *Id.* Here, the Court also need not decide whether the discovery rule should apply to ECOA claims, because Plaintiffs in the instant action have not alleged when they discovered the purported wrong.

**37.** Plaintiffs appear to cite the FDIC Cease & Desist Order, dated March 7, 2007, as proof that Defendants systematically extended credit to Plaintiffs on a discriminatory basis. (Am. Compl. ¶ 597.) However, such reliance is misplaced. Although the FDIC Order might demonstrate widespread unsound practices by Fremont, it does not establish a racially discriminatory practice, or a continuing

violation of the ECOA, as the FDIC Order makes no mention of race or discrimination. (Compl. Ex. 11.)

**38.** Additionally, Plaintiffs' ECOA claim is also a reverse redlining claim, and therefore on the merits shares the same deficiencies as did their FHA claim. Plaintiffs do not adequately allege that they were qualified for the loan they say they should have received; nor do they plead facts, as opposed to conclusory assertions, indicating either that they were intentionally targeted because of their race, or that non-African-American buyers received better terms than Plaintiffs' received. Instead, Plaintiffs generally state that African–Americans received worse terms than Caucasians, and otherwise recite the elements of a reverse redlining claim as formulaic assertions of legal conclusions.

[§ 1982] such as … the purchase and lease of property"). "In order to survive a motion to dismiss, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded in the complaint." *Dove v. Fordham Univ.*, 56 F.Supp.2d 330, 338 (S.D.N.Y.1999) (internal quotation marks omitted); *see also Sanders v. Grenadier Realty, Inc.*, 367 Fed.Appx. 173, 175 (2d Cir.2010) (summary order) (upholding district court's dismissal of § 1982 claim where "plaintiffs [did] not allege any facts supporting an inference of racial animus"). Thus, "[f]act-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required," and "[c]onclusory or naked allegations will not suffice." *Dove*, 56 F.Supp.2d at 338; *see also Dickerson v. State Farm Fire & Cas. Co.*, No. 95–CV–10733, 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996) ("It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was the product of racial animus. The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus.").[39]

Here, the Moving Defendants each argue that Plaintiffs fail to allege specific facts indicating that Defendants intentionally discriminated against Plaintiffs because of their race. (Fremont Mem. ¶¶ 65, 68–69; WCS Mem. 22–23; U.S. Bank Mem. 26.) Plaintiffs have not responded to these arguments in any of their opposition papers. However, the Court has still examined the Amended Complaint to determine if it sufficiently states a claim for this cause of action.

■■■ Plaintiffs allege that Fremont and WCS "intentionally discriminated against Plaintiffs by … charging them higher interest rates than those charges [sic] to similarly-situated Caucasian mortgagees," and that unfair loans "were aggressively marketed through Fremont's network of brokers to the African–American homeowners." (Am. Compl. ¶ 604.) Plaintiffs further claim that Tanenbaum used a "race-based" sales pitch (*id.* ¶¶ 146–47), and that Defendants targeted its discriminatory activities against minorities (*id.* ¶¶ 197, 271), without explaining how this targeting was conducted, or providing examples. Indeed, Plaintiffs do not specifically allege that Defendants took these purportedly discriminatory actions, or intended to take these actions, *because* Plaintiffs were African–American. Nor do Plaintiffs provide any facts in support of their contention that intentional discrimination occurred.[40]

Even after *Boykin*, these types of conclusory allegations of discrimination, unsupported by specific factual allegations, have been found insufficient to state a claim under §§ 1981 and 1982. *See Sanders*, 367 Fed.Appx. at 175 (concluding that

---

**39.** Of course, this is not to suggest that there is a heightened pleading requirement for claims of racial animus. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (rejecting a heightened pleading standard in Title VII context). But, after *Twombly*, Plaintiffs must sufficiently plead that they "are African–Americans, describe[ ] [D]efendants' actions in detail, and allege[ ] that [D]efendants selected [P]laintiffs for maltreatment solely because of their col-

or." *Boykin v. KeyCorp.*, 521 F.3d 202, 215 (2d Cir.2008) (alterations and internal quotation marks omitted).

**40.** Again, Plaintiffs have utterly failed to allege *any* discriminatory conduct by U.S. Bank, nor are any of their allegations directed at U.S. Bank. Therefore, Plaintiffs claims under the Civil Rights Act are dismissed against U.S. Bank with prejudice.

dismissal of § 1982 claim was proper because the plaintiffs' allegation "that 'defendants discriminated against plaintiffs on account of their race and national origin in violation of section 1982' d[id] not state a plausible claim to relief," and although a different paragraph in the complaint "d[id] allege facts consistent with a discrimination claim, i.e., that non-black residents were granted subsidies, it nevertheless 'stops short of the line between possibility and plausibility of entitlement to relief,' because plaintiffs d[id] not allege any facts supporting an inference of racial animus" (alterations, emphasis, and citations omitted) (quoting *Iqbal*, 129 S.Ct. at 1949)), *Ng*, 2010 WL 889256, at *12–13 (concluding that §§ 1981 and 1982 claims were wholly conclusory and lacked factual specificity); *Reyes v. Fairfield Props.*, 661 F.Supp.2d 249, 269 (E.D.N.Y.2009) (dismissing § 1982 claim where "[n]o identification of particular events or facts underlying the race-based discrimination claims [was] set forth in the amended complaint"); *see also Mian*, 7 F.3d at 1088 (dismissing § 1981 claim because "an essential element ... is a requirement that the alleged discrimination took place because of the [plaintiff's] race," and the "complaint fail[ed] to offer more than conclusory allegations that he was discriminated against because of his race"); *Dove*, 56 F.Supp.2d at 338 (dismissing § 1981 claim where the amended complaint was "devoid of facts to support [the plaintiff's] determination that the actions taken by [d]efendants were motivated by his race"); *Harary*, 983 F.Supp. at 99–100 (dismissing § 1982 claims because the plaintiff did not plead facts supporting her contention of intentional racial discrimination or supply any examples other than

her own); *cf. Barkley*, 2007 WL 2437810, at *11–12 (denying motion to dismiss §§ 1981 and 1982 claims, where the complaint "not only allege[d] that plaintiffs were targeted for fraud because of their race, but also contain[ed] detailed allegations of defendants' efforts to accomplish this targeting through advertising and other modes of minority-focused outreach and race-sensitive recruiting," but acknowledging that standing alone, an allegation that "the various actions constituting the fraud were taken deliberately and with racially discriminatory intent ... might be too conclusory to allege intentional racial discrimination" (internal quotation marks omitted)).[41]

■ "Section 1985(3) prohibits two or more persons from conspiring for the purpose of depriving any person of the equal protections of the laws." *Barkley*, 2007 WL 2437810, at *10. The elements of this claim are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian*, 7 F.3d at 1087. "[T]he conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* at 1088 (internal quotation marks omitted). Moreover, "[c]omplaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." *Brito v. Arthur*, 403

**41.** Plaintiffs have also included in their Amended Complaint a lengthy discussion of allegedly systematic racial discrimination in lending practices and the entire housing industry. (Am. Compl. ¶¶ 5–7, 11–14.) However-

er, these statements do not indicate that these particular Defendants committed intentionally racially discriminatory acts in general, let alone directed at these Plaintiffs.

Fed.Appx. 620, 621–22 (2d Cir.2010) (summary order) (internal quotation marks omitted) (affirming dismissal of § 1985(3) claim where "[a]side from conclusory assertions, [plaintiff] failed to provide any factual allegations that [defendants] engaged in a conspiracy, or that they were motivated by unlawful discriminatory intent or animus"); *see also Sajimi v. City of New York*, No. 07–CV–3252, 2011 WL 135004, at *7 (E.D.N.Y. Jan. 13, 2011) (" '[A] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' " (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997))); *Emmerling v. Town of Richmond*, No. 09–CV6418, 2010 WL 2998911, at *10 (W.D.N.Y. July 27, 2010) ("It is well-settled that vague or conclusory allegations of conspiracy are insufficient to state a claim under 42 U.S.C. § 1985." (citing *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir.1999))).

Plaintiffs allege that Defendants' "pattern of actions [that violated §§ 1981 and 1982] constitute a conspiracy for the purpose of depriving [P]laintiffs of the equal protection of the laws, or of equal privileges and immunities of the laws of the United States in violation of 42 U.S.C. § 1985(3)." (Am. Compl. ¶ 607.) Once again, Plaintiffs have failed to plead anything close to factual allegations that plausibly demonstrate that the Moving Defendants acted with intentional racial animus. This type of conclusory statement, which "consist[s] of little more than the bare language of the statute[ ]," is insufficient to withstand a motion to dismiss. *See Ng*, 2010 WL 889256, at *13.

Accordingly, Plaintiffs' §§ 1981, 1982, and 1985(3) claims are dismissed without prejudice as to WCS and Fremont, but with prejudice as to U.S. Bank.[42]

### H. Civil RICO Claims

Plaintiffs also assert Civil RICO violations of 18 U.S.C. § 1962(a), (c), and (d), against only WCS and Fremont, but not U.S. Bank.[43] "RICO is a broadly worded statute that has as its purpose the elimination of the infiltration of organized crime

---

42. Because Plaintiffs' Civil Rights Act claims are timely, but deficient as currently pled, these claims are dismissed without prejudice to allow Plaintiffs to amend their complaint to add allegations demonstrating that Defendants intentionally discriminated against them because of racial animus. For example, at oral argument, Plaintiff Darrick Grimes referred to statistics allegedly demonstrating that Fremont targeted residents in Plaintiffs' zip code, which is predominantly African–American. If Plaintiffs choose to amend, they should add this, and other specific, non-conclusory allegations, to the extent they exist. However, Mr. Grimes offered no hint of any additional allegations Plaintiffs could make as to U.S. Bank, which had nothing to do with offering loans to Plaintiffs.

43. Section 1962(a) provides that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate [ ] commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

and racketeering into legitimate organizations operating in interstate commerce." *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir.2001) (internal quotation marks omitted). The statute explicitly provides for civil remedies. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ...."). However, "[i]n considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants [and] [a]ccordingly, [ ] should look with particular scrutiny at [these] claims to ensure that the RICO statute is used for the purposes intended by Congress." *Purchase Real Estate Grp. Inc. v. Jones*, No. 05–CV–10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010) (internal quotation marks and citations omitted); *see also Manhattan Telecomms. Corp. v. DialAmerica Mktg., Inc.*, 156 F.Supp.2d 376, 380 (S.D.N.Y.2001) ("Because the mere assertion of a RICO claim ... has an almost stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." (internal quotation marks omitted)).

▮▮▮▮ "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir.2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir.2001) (internal quotation marks omitted)). "[U]nder any prong of § 1962, a plaintiff in a civil RICO suit must establish a pattern of racketeering activity ... [and][t]o survive a motion to dismiss, this pattern must be adequately alleged in the complaint." *Id.* (citation and internal quotation marks omitted). Fremont and WCS argue that, inter alia, Plaintiffs have failed to adequately allege that they engaged in such a pattern of racketeering activity. (Fremont Mem. ¶¶ 79–83; WCS Mem. 26.)[44] Plaintiffs' opposition papers do not respond to this argument, or even mention their civil RICO claims; however, due to Plaintiffs' pro se status, the Court has still considered whether the Amended Complaint sufficiently states a RICO claim.

▮▮▮ A " 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The acts constituting the pattern must be among the criminal offenses listed in § 1961(1), which include violations of the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343.[45] Additionally, the acts must be "related, and ... [either] amount to or pose a threat of continuing criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*

---

**44.** Fremont also asserts that Plaintiffs have failed to allege that it committed any predicate criminal acts as required by the RICO statute. (Fremont Mem. ¶¶ 77–78.) WCS additionally argues that: (i) Plaintiffs' § 1962(a) claim fails because they have not properly alleged that they were harmed by any supposed investment itself; (ii) Plaintiffs' § 1962(c) claim fails because the acts they allege WCS committed do not constitute criminal predicate acts, and Plaintiffs cannot establish fraudulent intent by WCS or reliance by Plaintiffs; and (iii) Plaintiffs' § 1962(d)

claim fails because it is predicated on a violation of one of the other substantive sections of the provision. (WCS Mem. 26–28.)

**45.** "The elements of mail and wire fraud are: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme." *Atkins v. Apollo Real Estate Advisors, L.P.*, No. 05–CV–4365, 2008 WL 1926684, at *11 n. 11 (E.D.N.Y. Apr. 30, 2008).

187 F.3d 229, 242 (2d Cir.1999) (emphasis and internal quotation marks omitted). This "so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool,* 520 F.3d at 183.

▮▮▮▮ Thus, closed-ended continuity is established by "a series of related predicates extending over a substantial period of time," *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 242, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "The relevant period [ ] is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool,* 520 F.3d at 184. Moreover, since the Supreme Court decided *H.J. Inc.* in 1989, the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time,'" and "[a]lthough [the Circuit] ha[s] not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity." *Id.* (internal quotation marks omitted). Additionally, "all allegations of fraudulent predicate acts [ ] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 178 (2d Cir.2004); *see also Purchase Real Estate,* 2010 WL 3377504, at *8 (stating that allegations of predicate wire and mail fraud acts "must 'specify the statements plaintiffs claim were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" (alterations omitted) (quoting *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172–73 (2d Cir.1999))); *Schuh v. Druckman & Sinel, L.L.P.,* No. 07–CV–366, 2008 WL 542504, at *8 (S.D.N.Y. Feb. 29, 2008) ("It has long been established in this Circuit that the particularity requirements of [ ] 9(b) are applicable to RICO claims where, as here, such claims are based on mail fraud ... or wire fraud ....").

In contrast, open-ended continuity requires "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit,* 187 F.3d at 242. "The Second Circuit has observed that inherently unlawful acts, such as murder, committed in pursuit of inherently unlawful goals, such as narcotics trafficking, are generally found to generate the requisite threat of continuity even if the time period is short, while racketeering activities furthering endeavors that are not inherently unlawful, such as frauds in the sale of property, are generally found wanting despite even longer periods of time." *Purchase Real Estate,* 2010 WL 3377504, at *11. In the latter situation, when the alleged enterprise primarily conducts a legitimate business, "the business at issue [must be] ongoing, thereby making it likely that the racketeering acts will continue into the future." *Id.*

▮▮▮ Here, Plaintiffs allege that an enterprise, consisting of an association in fact of Fremont, WCS, their agents, and other parties previously terminated as Defendants in this case, "operated separately and distinct from each individual RICO Defendant ... to implement and conduct the 'Mortgage Fraud,' which has been operated over the course of at least a two-year period through the use of mail, wire, and tax fraud, and the collection of unlawful fees, and involving hundreds of vic-

tims." (Am. Compl. at unnumbered page 138, between ¶¶ 613 and 614.) Plaintiffs further state that "during the relevant times" Defendants "repeated this pattern—that is, the fraudulent use of interstate mails and wires—in each of several hundred similar real estate transactions that were part of the Mortgage Fraud," and "were involved in the transactions involving Named Plaintiffs and other members of the Class over a period spanning at least two years." (*Id.* ¶¶ 617, 623, 638.) According to Plaintiffs, WCS employees Tanenbaum and McBean "closed transactions for the enterprise ... from its inception until about August 2006" (*id.* ¶ 639), and the "illegal activities of the RICO Defendants persisted over an extended period of time starting in or before 2005 and ending, on information and belief, in mid–2006," (*id.* ¶ 664).

These allegations do not establish a pattern of racketeering activity that meets the requirements for either closed-ended or open-ended continuity. Plaintiffs have not sufficiently alleged close-ended continuity, because they have not adequately pled predicate acts over a period of at least two years, the amount of time the Second Circuit has generally found necessary to establish close-ended continuity. *See Spool,* 520 F.3d at 184; *see also Wiltshire,* 421 F.Supp.2d at 550 ("The Amended Complaint's nineteen-month period of predicate activity is therefore insufficient under Second Circuit precedent to establish closed-ended continuity."). Even assuming, arguendo, that the Amended Complaint contains sufficient particularity regarding the alleged mail and wire fraud acts taken against Plaintiffs directly, those acts were taken in September and October 2005—a two-month period that is far shorter than the Second Circuit has required to find closed-ended continuity. In addition, although Plaintiffs assert that the enterprise operated for over two years (Am. Compl.

¶ 638), and that the illegal activities persisted from in or before 2005 until mid–2006 (*id.* ¶ 664), they provide no basis for that belief, or *any* facts regarding when the enterprise began, or other specific predicate acts of mail and wire fraud. Plaintiffs' conclusory allegation that Defendants had a pattern of using the mail and wires to commit fraudulent acts that persisted for over two years in hundreds of transactions, without any specifics, fails to meet the particularity requirements of Rule 9(b), and simply is insufficient to satisfy Plaintiffs' pleading burden. *See Purchase Real Estate,* 2010 WL 3377504, at *8 ("While courts have made an exception to the particularity requirements and have allowed allegations to be based on information and belief when facts are peculiarly within the opposing party's knowledge, this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations, especially in the context of RICO claims." (alterations and internal quotation marks omitted)).

Additionally, Plaintiffs have not established open-ended continuity—which requires a threat of ongoing, continuing criminal activity—because they specifically allege that the enterprise ended in 2006. (Am. Compl. ¶¶ 639, 664.) *See Purchase Real Estate,* 2010 WL 3377504, at *11 (holding that open-ended continuity was not established where plaintiffs had alleged no basis from which the court could conclude that continuation of the purported racketeering activities was likely at the time the complaint was filed). Because Plaintiffs have not properly alleged either closed-ended or open-ended continuity, they have failed to adequately allege a pattern of racketeering activity, and their RICO claims must be dismissed with prejudice.

### I. State Law Claims

Subject matter jurisdiction over Plaintiffs' state law claims is alleged based on supplemental jurisdiction. (Am. Compl. at unnumbered page 2.) A "district court[ ] may decline to exercise supplemental jurisdiction over a claim ... if ... [it] has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) (citations and internal quotation marks omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

▮▮▮ Here, the Court has currently dismissed all of Plaintiffs' federal claims. Because the Court grants Plaintiffs leave to amend some of their federal claims, the Court finds that judicial economy, convenience, and fairness would not be served by this Court exercising supplemental jurisdiction over Plaintiffs' state law claims until Plaintiffs have adequately alleged a federal cause of action, and to do so would be inconsistent with the principle of comity. This is particularly true in light of the pending foreclosure action in state court, in which Plaintiffs have asserted some of these state law claims as affirmative defenses. *See Q Mktg. Grp., Ltd. v. P3 Int'l Corp.*, No. 05–CV–261, 2005 WL 1863791, at *5 (S.D.N.Y. Aug. 4, 2005) (declining to exercise supplemental jurisdiction over state contract and tort law claims where the plaintiff had not pleaded a federal claim and there was a pending state court action involving the state law claims); *Kulesza v. N.Y.U. Med. Ctr.*, 129 F.Supp.2d 267, 274 (S.D.N.Y.2001) (declining to exercise supplemental jurisdiction where the "[p]laintiffs ha[d] already filed a state court action that ha[d] been stayed pending the outcome of the instant case," and the defendants' motion to dismiss the state law claims in the state court action had been "denied without prejudice to renewal if the state court action resumed"). The Court is granting Plaintiffs the opportunity to amend their pleadings with respect to their Civil Rights Act claims. If Plaintiffs amend to successfully allege a federal cause of action, the Court will entertain Plaintiffs' state law claims at that time; conversely, if Plaintiffs' fail to state a federal claim, the Court will decline to exercise supplemental jurisdiction over their state law claims. Accordingly, the Moving Defendants' motions to dismiss Plaintiffs' state law claims are denied without prejudice until Plaintiffs' decision on whether to amend their complaint, and may be renewed if Plaintiffs amend to adequately plead a federal cause of action.

### III. Conclusion

For the reasons discussed above, the motions to dismiss of Fremont, WCS, and U.S. Bank are granted in part. Fremont's motion to dismiss the Amended Complaint against FGC pursuant to 11 U.S.C. § 362(a) is denied as moot. Plaintiffs' TILA, HOEPA, RESPA, FHA, ECOA, and Civil RICO claims are dismissed with prejudice as to all Moving Defendants. However, given Plaintiffs' pro se status, the Court will allow Plaintiffs to amend their Civil Rights Act claims to attempt to cure the deficiencies in the Amended Complaint as to Fremont and WCS. Therefore, Plaintiffs' Civil Rights Act claims are dismissed without prejudice as to Fremont

and WCS, but with prejudice as to U.S. Bank. Plaintiffs' class action claims for violation of the Donnelly Act, unfair and deceptive business practices, and unjust enrichment are dismissed without prejudice. The Moving Defendants' motions to dismiss Plaintiffs' state law claims are denied without prejudice to renewal at a later date as explained above. The Clerk of Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 106, 110, 117.)

SO ORDERED.